IN THE UNITED STATES DISRICT COURT FOR THE

WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SCREEN ACTORS GUILD – AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, AFL-CIO<br>625 Stanwix Street, Suite 2007<br>Pittsburg, PA 15222,<br>　　　　　　　　Plaintiff<br><br>v.<br><br>SHERIDAN BROADCASTING NETWORKS<br>715 Ambrose Avenue<br>Pittsburgh, PA 15232,<br><br>　　and<br><br>SHERIDAN BROADCASTING CORPORATION<br>715 Ambrose Avenue<br>Pittsburgh, PA 15232,<br><br>　　and<br><br>RONALD DAVENPORT, JR.<br>715 Ambrose Avenue<br>Pittsburgh, PA 15232<br><br>　　and<br><br>RONALD DAVENPORT, SR.<br>5837 Soloway Street<br>Pittsburgh, PA 15217<br>　　　　　　　Defendants | Civil Action No. 18- |

## COMPLAINT

Plaintiff, the Screen Actors Guild, American Federation of Television and Radio Artists,

AFL-CIO ("Union"), through its undersigned counsel, brings this action, against Sheridan

Broadcasting Networks ("SBS") and Sheridan Broadcasting Corporation ("SBC") (collectively "Employers") to enforce a labor arbitration award and against the Employer and individual defendants, Ronald Davenport Jr. ("Junior") and Ronald Davenport, Sr. ("Senior") for violations of the Pennsylvania Wage Payment and Collection Law ("WPCL"), ("WPCL"), Act of July 14, 1961, P. L. 637, §1*et seq.*; 43 P.S. §260.1, *et seq.*.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter pursuant to Section 301(c) of the Labor-Management Relations Act of 1947, as amended ["LMRA"], 29 U.S.C. § 185(c), 28 U.S.C. §1331 and 28 U.S.C. §1367.

2. Venue is appropriate pursuant to Section 301(a) of the LMRA, 29 U.S.C. § 185(a) and 28 U.S.C. § 1391(b).

## PARTIES

3. The Union is a non-stock corporation, organized and existing under the laws of the State of Delaware with an office located at 625 Stanwix Street, Suite 2007, Pittsburgh, Pennsylvania 15222. The Union is a labor organization within the meaning of Section 2(5), of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 152(5), Section 301( ) of the LMRA, 29 U.S.C. § 185, and Section 9.1(a) of the Pennsylvania Wage Payment and Collection Law ("WPCL"), Act of July 14, 1961, P. L. 637, §9.1; 43 P.S. §260.9a(a).

4. SBN is a corporation organized and existing under the laws of the State of Delaware, with an agent located at 715 Ambrose Avenue, Pittsburgh, Pennsylvania 15232. SBN is an employer within the meaning of Section 2(2), of the NLRA, 29 U.S.C. § 152(2),

Section 301( ) of the LMRA, 29 U.S.C. § 185, and Section 2.1 of the WPCL 43 P.S. §260.2a.

5. SBC is a corporation organized and existing under the laws of the State of Delaware, with an agent located at 715 Ambrose Avenue, Pittsburgh, Pennsylvania 15232. SBN is an employer within the meaning of Section 2(2), of the NLRA, 29 U.S.C. § 152(2), Section 301( ) of the LMRA, 29 U.S.C. § 185, and Section 2.1 of the WPCL 43 P.S. §260.2a.

6. The defendant Junior is an officer and agent of the Employer within the meaning of Section 2.1 of the WPCL 43 P.S. §260.2a. He lives at 715 Ambrose Avenue, Pittsburgh, Pennsylvania 15232.

7. The defendant Senior is an officer and agent of the Employer within the meaning of Section 2.1 of the WPCL 43 P.S. §260.2a. He lives at 5837 Solway Street, Pittsburgh, Pennsylvania 15217.


## FACTS

8. At all times relevant hereto, SBN and SBC were the alter egos of each other in that SBC exercised total dominion and control over SBS and SBC at all relevant times exercised total dominion and control over SBN and that SBN and SBC have so intermingled their financial affairs and managerial structures that they were the alter egos of each other and are thus each liable for each other's obligations.

9. At all times relevant hereto, SBN and SBC functioned in a manner as if they were a single employer in that their financial affairs and managerial structures are so intermingled that every act or omission on the part of SBN can be attributed to SBC

and every act or omission on the part of SBC can be attributed to SBN and that the Defendants are thus each liable for each other's obligations

10. At all times relevant hereto, the Union has represented for purposes of collective bargaining all regular full-time and part-time newspersons, audio journalists and producers employed by SBN in the United States.

11. The Union and SBN have been parties to a collective bargaining agreement ("CBA"), covering the period of November 8, 2016 through November 7, 2019. (A true and correct copy of the CBA is attached to this Complaint and marked as Exhibit 2.) The CBA sets forth, *inter alia,* the terms and conditions of employment of the employees of SBN represented by the Union for purposes of collective bargaining.

12. Pursuant to Schedule 1, Sections 7 and 11 of the CBA, controversies or disputes arising out of the interpretation or allegations of breach of the CBA are to be submitted to a grievance procedure.

13. If a grievance cannot be resolved through the grievance procedure, set forth in the CBA, the Union is authorized pursuant to Step Two of Schedule 1, Section 7 of the CBA, to submit the grievance to binding arbitration.

14. Under the terms of Schedule 1, Section 7 of the CBA:

The arbitrator shall only have the authority to interpret compliance with the provisions of this Agreement, and shall not have authority to add to, subtract from or alter in any way the provisions of this Agreement. The decision of the arbitrator on any issue properly before him/her shall be final and binding upon the Employers, the Union and the employee or employees involved.

15. The Union filed a grievance alleging that: (a) on or about August 29, 2017 SBNs terminated all employees represented by the Union and in so doing (1) failed to give proper notice of termination as required by Schedule III, Section 10 of the CBA to

said employees and further failed to pay said employees as required by Schedule III, Section 10 of the CBA; (2) failed to pay all employees terminated as of August 29, 2017 severance pay as required by Schedule III, Section 10 of the CBA; and (b) failed to pay all employees for work they performed between August 16, 2017 and August 29, 2017.

16. The Union further alleged in its grievance that SBN further (a) failed to implement a 3% wage increase effective November 8, 2016 for all employees in a timely fashion and after implementing the 3% wage increase failed to make the employees whole for its untimely implementation; (b) failed to pay employees represented by the Union for out-of-pocket expenses incurred in the performance of their assigned duties; and (c) failed to remit to the Union dues withheld from the pay checks of employees who were represented by the Union for purposes of collective bargaining.

17. Because the grievance was not resolved in the grievance procedure, the Union, pursuant to the provisions of the CBA, filed a request for an arbitration panel with the Federal Mediation and Conciliation Service ("FMCS"), such request being docketed at FMCS Case No. 17-54919.

18. Dennis Minni, Esquire, was selected by the Union and SBN to serve as arbitrator to resolve the dispute and a hearing was scheduled for November 20, 2017.

19. On November 15, 2017, the Union and SBN submitted a series of Exhibits, including Exhibit A, which constituted a set of fifty one (51) stipulated facts, including, *inter alia*, the failure of SBN to pay one employee her clothing allowance and reimbursement, and the failure to transmit Union dues withheld from the paychecks of the employees represented by the Union; Exhibit B, which set forth the amount of

pay in lieu of written notice of termination and severance pay owed eleven (11) employees; Exhibit C, which set forth the following: back pay owed ten (10) employees as a result of SBN's untimely implementation of the November 8, 2016 3% wage increase, pay for ten (10) employees for salary owed during the period of August 16-31, 2017, and remuneration for six (6) employees for money owed for certain wraps and voices; and Exhibit D, which totaled all monies owed. (True and correct copies of Exhibits A, B, C and D are attached hereto and marked as Exhibit 2.)

20. On November 20, 2017, the Union and SBN appeared before the arbitrator and stipulated that the grievance was properly before the arbitrator. The parties relied on the exhibits previously submitted, as described in Paragraph 15 of the Complaint. At the hearing, SBN stipulated to its liability.

21. On February 2, 2018, the arbitrator issued his Opinion and Award ("Award") in which he granted the relief sought by the Union. (A true and correct copy of the Award is attached hereto and marked as Exhibit 3).

22. A copy of the Award was served upon SBN on February 8, 2018.

23. Notwithstanding the issuance of the Award and demand for payment by Plaintiff, the Employers have failed and refused to comply with the terms thereof nor have the Employers filed a complaint to vacate the terms of the Award.


# COUNT I – BREACH OF CONTRACT FOR FAILURE TO COMPLY WITH A LABOR ARBITRATION AWARD

24. Paragraphs 1 through 23 of the Complaint are re-alleged as if fully set forth herein.

25. Under the terms of the CBA, the Award is final and binding.

26. The Award is rationally derived from the CBA and draws its essence therefrom.

27. The failure of the Employers to comply with the Award is a breach of the CBA.


## COUNT II – VIOLATION OF THE WPCL

28. Paragraphs 1 through 27 of the Complaint are re-alleged as if fully set forth herein.

29. The monies owed to the various employees of the defendant Employers as set forth in Exhibit 2 of this Complaint are wages within the meaning of the WPCL.

30. The employees of the defendant Employers as set forth in Exhibit 2 of this Complaint are represented by the plaintiff Union.

31. The defendant Employers failed to pay the employees the wages owed these employees as set forth in Exhibit 2 of this Complaint.

32. At all times relevant hereto, Senior and Junior are agents and officers of defendants SBS and SBC with the authority and responsibility to pay employee wages.

## COUNT III- CONVERSION

33. Paragraphs 1 through 32 of the Complaint are re-alleged as if fully set forth herein.

34. At all times relevant defendants were interfering with and depriving the Union's right of, and/or use of, the by unlawfully withholding Union dues of the employees of the Employers represented by the plaintiff Union without tendering those dues to the Union.

35. The plaintiff Union has demanded that defendants release the Union dues.

36. Defendants at all times relevant failed to comply with the plaintiff Union's legal and justified demands.

37. In so doing, defendants interfered with the Union's' right to employees' Union dues that the defendants withheld from employee wages. Defendants thus breached their fiduciary obligation to plaintiffs by these improper and illegal acts.

38. At all relevant times defendants' actions were done without the plaintiff Union's consent.

39. At all relevant times defendants were without any lawful justification for their actions.

40. Defendants' actions were both malicious and willful.

WHEREFORE, the Plaintiff Union hereby seeks:

(1) An entry of an order requiring the defendant Employers comply in each and every respect with the February 2, 2018 Award;

(2) Enter judgment for the Union and against the defendant Employers in the amount of $325,827.64, composed of $36,343.29 in wages to be paid in lieu of notice of termination to employees represented by the plaintiff Union, $170,685.12 in severance pay owed employees represented by the plaintiff Union, $2,812.38 in unpaid wages owed employees represented by the plaintiff Union attributable to the November 8, 2016 3% wage increase, $18,829 in wages owed employees represented by the plaintiff Union for the period of August 16 through 31, 2017 and for wraps and voices produced during the month of August, 2017, $9,088.39 for clothing allowance, mileage and expenses incurred by employees of the defendant Employers incurred during the course of employment, $2,293.09 for Union dues withheld from the wages of employees represented by the Union pursuant to valid dues check off authorizations but never transmitted to the plaintiff Union, and

liquidated damages of 25% of wages owed, pursuant to the WPCL, in the amount of $65,165,53;

(3) Punitive damages in the amount of $250,000.00 for the breach of the defendants' fiduciary duties;

(4) Reasonable attorney's fees and costs; and

(5) Any other relief that this Honorable Court shall order.

Respectfully submitted,

MARKOWITZ & RICHMAN

BY: _____
Peter Demkovitz, Esquire
PA Attorney I. D. No.75319
123 S. Broad Street, Suite 2020
Philadelphia, PA 19109
Telephone: (215) 875-3119
Telefax: (215) 790-0668
Email: pdemkovitz@markowitzandrichman.com

Of Counsel:

Jonathan Walters, Esquire
PA Attorney I. D. No.75319
123 S. Broad Street, Suite 2020
Philadelphia, PA 19109
Telephone: (215) 875-3121
Telefax: (215) 790-0668
Email: jwalters@markowitzandrichman.com

Dated: April 6, 2018

# EXHIBIT 1

**AGREEMENT**

**BETWEEN**

**SAG-AFTRA**

**(AFL-CIO)**

**AND**

**SHERIDAN BROADCASTING
NETWORKS**

**November 8, 2016 – November 7, 2019**

**2016-2019**

# SAG-AFTRA—SHERIDAN BROADCASTING NETWORKS AGREEMENT

## Table of Contents

| | | |
|---|---|---|
| **SCHEDULE I** | | 1 |
| SECTION 1. | SCOPE OF AGREEMENT | 1 |
| SECTION 2. | WARRANTY AND RECOGNITION | 1 |
| SECTION 3. | UNION MEMBERSHIP | 1 |
| SECTION 4. | MANAGEMENT RIGHTS | 2 |
| SECTION 5. | ADMISSION TO PREMISES | 2 |
| SECTION 6. | SHOP STEWARD | 2 |
| SECTION 7. | GRIEVANCES | 3 |
| SECTION 8. | NO STRIKE CLAUSE | 3 |
| SECTION 9. | MINIMUM TERMS AND CONDITIONS | 3 |
| SECTION 10. | DEDUCTIONS | 4 |
| SECTION 11. | ARBITRATIONS | 4 |
| SECTION 12. | NO DISCRIMINATION | 5 |
| SECTION 13. | COMPLIANCE WITH LAW | 5 |
| SECTION 14. | AFTRA HEALTH AND RETIREMENT | 5 |
| SECTION 15. | SUBSTANCE ABUSE POLICY | 5 |
| **SCHEDULE II - STAFF SALARIES AND DUTIES** | | 5 |
| SECTION 1. | | 5 |
| SECTION 2. | MINIMUM BASE SALARY | 7 |
| SECTION 3. | NON-BROADCAST DUTIES | 9 |
| SECTION 4. | FREELANCE EMPLOYEES AND STRINGERS: | 9 |
| SECTION 5. | PART-TIME | 9 |
| **SCHEDULE III - WORKING CONDITIONS** | | 10 |
| SECTION 1. | WORK WEEK AND WORK DAY | 10 |
| SECTION 2. | DAYS OFF | 11 |
| SECTION 3. | EXPENSES AND TRAVEL | 11 |
| SECTION 4. | MEALS | 11 |
| SECTION 5. | REST BETWEEN STAFF STRETCHES | 11 |
| SECTION 6. | NOTICE OF STAFF STRETCH | 11 |
| SECTION 7. | OFF-PREMISES WORK | 11 |
| SECTION 8. | VACATIONS | 12 |
| SECTION 9. | SICK LEAVE/PERSONAL LEAVE/BEREAVEMENT LEAVE | 12 |

SECTION 10.    TERMINATION AND SEVERANCE PAY ............................................................. 13

SECTION 11.    COMBAT ZONE PAY........................................................................................... 14

SECTION 12.    NEWS PROGRAMS AND INSERTS MADE AVAILABLE TO OTHER
NETWORKS AND STATIONS.................................................................................................. 14

SECTION 13.    RELOCATION EXPENSES.................................................................................... 14

SECTION 14.    NON-WAIVER OF RIGHTS .................................................................................. 15

SECTION 15.    TERM OF AGREEMENT ....................................................................................... 15

SECTION 16.    OUTSIDE EMPLOYMENT .................................................................................... 15

SECTION 17.    NAME OF AGREEMENT ...................................................................................... 15

Sideletter #1 ......................................................................................................................... 17

Sideletter #2 ......................................................................................................................... 18

Sideletter #3 ......................................................................................................................... 19

Sideletter #4 ......................................................................................................................... 20

Sideletter #5 ......................................................................................................................... 21

Appendix A ........................................................................................................................... 22

# SAG-AFTRA -SHERIDAN BROADCASTING NETWORKS

Agreement as of November 8, 2016, between **SAG-AFTRA**, a non-stock corporation, organized and existing under the laws of the State of Delaware and having its principal offices at 5757 Wilshire Blvd., Los Angeles, CA, 90036, party of the first part (hereinafter called " SAG-AFTRA") and **SHERIDAN BROADCASTING NETWORKS**, a corporation organized and existing under the laws of the State of Delaware and having its principal office at 960 Penn Avenue, Pittsburgh, PA, 15222, party of the second part (hereinafter called "the Company" or "SBN"). In consideration of the covenants and agreements herein contained, it is agreed as follows:

## SCHEDULE I

### SECTION 1.      SCOPE OF AGREEMENT

This Agreement shall apply to all regular full-time and regular part-time newspersons, audio journalists and producers(hereinafter "covered employees") employed by the Company at its principal offices in Pittsburgh, Pennsylvania and its office in Washington, D.C., or any successor location thereof, when they are performing at any location within the United States. This Agreement shall apply to any covered employee sent from the United States to any foreign location for a period of one (1) year or less.

All covered employees shall carry forward into this contract, for all purposes, their length of service attained under previous agreements between the Company and SAG-AFTRA.

The term "newspersons" shall refer to all on-air performers, whether performing on news programs or other programs, such as entertainment or ports.

### SECTION 2.      WARRANTY AND RECOGNITION

(a)      AFTRA warrants, represents and agrees that it represents, for collective bargaining purposes, all covered employees employed by the Company.

(b)      The Company hereby and without prejudice to the foregoing recognizes SAG-AFTRA as the exclusive collective bargaining agent for all covered employees employed by the Company, subject to provisions of Section 9(a) of the National Labor Relations Act, as amended.

### SECTION 3.      UNION MEMBERSHIP

SAG-AFTRA agrees that it will accept as a member of SAG-AFTRA any persons the Company wishes to employ as a regular full-time and regular part-time newsperson, audio journalist or producer, except persons not eligible for membership under the Union's Constitution(s), By-Laws, or Rules.  SAG-AFTRA further agrees that it will not impose unreasonable entrance fees, dues assessments, or other requirements.  The Company will deduct union dues from an employee's paycheck as long as the union presents to the Company a current dues check-off card signed and authorized by the employee.

Except as provided in the Section, the right of a person to work for the Employer shall not be denied or abridged on account of membership or non-membership in any other labor union of labor organization.

During the term of this Agreement the Company will, at locations where bargaining unit work under this Agreement is performed, employ and maintain in its employment only such regular full-time and regular part-time newspersons, audio journalists and producers covered by this Agreement as are members of SAG-AFTRA in good standing, or who shall make application for membership on or after the thirtieth (30th) day following their date of hire or the ratification of this Agreement, whichever occurs later, and who shall thereafter maintain such membership in good standing as a condition of continued employment.

## SECTION 4.   MANAGEMENT RIGHTS

The Company retains the sole right to manage its business, including but not limited to:

(a)   The right to decide the number and location of places where the Company conducts its business, the equipment, the methods, and the schedules;

(b)   The right to maintain order and efficiency in its operations, to hire employees, layoff employees, assign employees, transfer employees, promote employees, create new positions, and assign work to employees;

(c)   The right to determine the starting and quitting time and the number of hours to be worked;

(d)   The right to implement reasonable rules and regulations, subject to the grievance and arbitration procedure regarding the reasonableness of said rules and/or regulations; and

(e)   All other rights and prerogatives, subject only to such restrictions governing the exercise of these rights as are provided in this Agreement.

## SECTION 5.   ADMISSION TO PREMISES

Any officer or other duly authorized representative of SAG-AFTRA shall be admitted to the premises for the Company at any reasonable time for the purpose of determining the maintenance of wages and working conditions hereunder; provided that such officer or representative shall give the Company reasonable advance notice of his/her visit, shall exhibit satisfactory evidence of his/her office and authority, and shall not interfere with the conduct of the Company's business. Any person so admitted shall comply with all the rules and regulations of the Company while on its premises.  Not more than two such persons shall be entitled to admission at the same time.

## SECTION 6.   SHOP STEWARD

The Company agrees that SAG-AFTRA shall have the right to appoint, or the covered employees at the company shall elect, a Shop Steward from among the

SAG-AFTRA members employed by the Company, and such steward shall be recognized by the Company as SAG-AFTRA's employee representative. The Shop Steward shall have no authority to settle disputes or interpret the Agreement but shall report to SAG-AFTRA all matters brought to his or her attention relating to the application of the contract.

## SECTION 7.  GRIEVANCES

Grievances will be resolved in accordance with the procedure described in Paragraph 11 hereof.

## SECTION 8.  NO STRIKE CLAUSE

SAG-AFTRA agrees that, during the term of this Contract, covered employees will not engage in any strike, work slowdown, picketing, boycott or other work stoppage against the Company. The Company agrees, however, that in the event SAG-AFTRA is striking on behalf of the newspersons, audio-journalists or producers at ta station serviced by the Company, the Company will not, without the prior consent of SAG-AFTRA, require covered employees hereunder to render services on programs for that station in excess of the number of programs usually provided to it.

SAG-AFTRA further agrees that no covered employee shall refuse to cross a picket line set up by any union, group of unions or their members at, around or in the Company's premises, unless the covered employee has been threatened with harm if s/he crosses the picket line.

In the event that covered employees violate this provision of the collective bargaining Agreement, the Company may, at its option, terminate this contract upon written notice to SAG-AFTRA.

The Company similarly agrees that it shall not lock out covered employees during the term of this Agreement.

## SECTION 9.  MINIMUM TERMS AND CONDITIONS

The Company agrees that this Agreement sets forth the minimum terms and conditions which cover the employment of covered employees. The Company agrees that it will make no contract with any covered employee on terms less favorable to such covered employee than those contained in this Agreement and make no changes or alterations of these provisions without the written consent of SAG-AFTRA, nor, without such consent, shall any covered employee be deemed engaged upon terms which would commit such covered employee to perform any services after this Agreement expires or is terminated which would violate any rule of SAG-AFTRA. Issuance of, or compliance with, such SAG-AFTRA rule shall not subject SAG-AFTRA or SAG-AFTRA members to any liability. The company agrees that no waiver by any covered employee of any provisions contained in this Agreement shall be sought by the Company from the covered employee or be effective unless written consent of SAG-AFTRA to such waiver is first had and obtained, and the Company further agrees that nothing in this Agreement shall be deemed to prevent any covered employee from negotiating for or obtaining better terms than the minimum terms provided in this Agreement. The Company further

agrees, for the benefit of SAG-AFTRA and covered employees employed by the Company, that existing contracts with all covered employees are hereby modified in accordance herewith, but no terms, wages or hours in such existing contracts which are more favorable to the covered employee than those herein specified shall be deemed so modified.

## SECTION 10.     DEDUCTIONS

No deductions, directly or indirectly, by way of commission or otherwise, may be made by which any covered employee shall receive less than the minimums established by this Agreement, such minimums being net to the covered employee, except for withholdings or deductions which are permitted by law.

## SECTION 11.     ARBITRATIONS

<u>Meeting with Management.</u>     The Union stewards may request a meeting with Company managers at the quarterly meetings held by Company managers in order to discuss issues involving the bargaining unit.

<u>Filing of Grievances</u>
In the event there should be any controversy or dispute arising out of the interpretation or alleged breach of this Contract between SAG-AFTRA and the Company, the parties agree to promptly and in good faith attempt to settle such dispute amicably. In the event they are unable to do so, any such controversy or dispute shall be handled according to the following procedure:

<u>Step One.</u>     The Union shall submit the grievance to Management of the Company, in writing, within fifteen (15) working days of the date the Union knew or should have known of the action(s) giving rise to said grievance. The parties shall attempt to resolve the issue as quickly as possible.

<u>Step Two.</u>     If the grievance is not settled at Step One, the Union may submit the grievance to arbitration within thirty (30) days after the Step One meeting by filing a request for a panel from the Federal Mediation and Conciliation Service. Upon receipt of the panel, each party shall have the right to strike one (1) name until only one arbitrator remains on the list, who shall hear and decide the case.

The time limitations set forth above in Steps One and Two of this procedure may be extended only by the express mutual agreement between the Company and the Union.

The arbitrator shall only have the authority to interpret compliance with the provisions of this Agreement, and shall not have authority to add to, subtract from or alter in any way the provisions of this Agreement. The decision of the arbitrator on any issue properly before him/her shall be final and binding upon the Company, the Union and the employee or employees involved. The cost of arbitration, including the salary and expense incident to the services of the arbitrator, shall be shared equally by both parties.

4

## SECTION 12. NO DISCRIMINATION

The Company and SAG-AFTRA shall comply with all applicable federal, state local anti-discrimination laws.

The Company and SAG-AFTRA further agree not to discriminate against any covered employee because of any claim made by such a person or submitted to arbitration by him/her through SAG-AFTRA as herein provided, respecting the performance of this Agreement by the Company.

## SECTION 13. COMPLIANCE WITH LAW

If there are any provisions of the National Labor Relation Act, as amended, which are in conflict with this Agreement, such conflicting provisions of this Agreement shall be deemed modified so as to conform to the provisions of said Act.

## SECTION 14. AFTRA HEALTH AND RETIREMENT

The Company shall pay the American Federation of Television and Radio Artists Health and Retirement Funds a sum equal to 10.5% of the gross compensation of each employee payable on a monthly basis (10.75% effective November 8, 2018).

## SECTION 15. SUBSTANCE ABUSE POLICY

(See Appendix "A").

## SCHEDULE II - STAFF SALARIES AND DUTIES

## SECTION 1.

### A. EXCLUSIVE STAFF DUTIES

*Newspersons*

> Primary Duties:
> Gathering, preparing, reporting, editing and writing news for over the air broadcasts and for transmission and/or recording for the Internet.
>
> Performing announcements, both commercial and non-commercial.
>
> Performing those duties consonant with similar duties performed by radio journalists and announcer.
>
> Secondary Duties:
> On a sporadic and occasional basis to fill the Company's need to unforeseen operating exigencies, Newspersons may perform the following duties:
>
> The operation of equipment in conducting interviews.
>
> Cutting audio and operating the board, in the absence of an audio journalist.

*Audio Journalists*

Primary Duties:
Editing news audio tape; off air interviewing; writing and editing news copy for over the air broadcast and for transmission and/or recording for the Internet; and voicing and videotaping material for the Internet.

Contacting network affiliates and news sources.

Initiating and covering stories.

Operation News Line (operation of off line news down and up links).

Producing, writing and narrowcasting closed circuit feeds to affiliates.

Collecting information and actuality material for broadcast.

Assisting newspersons in the preparation of network materials for broadcast.

Secondary Duties:
On a sporadic and occasional basis to fill the Company's need for unforeseen operating exigencies, Audio Journalists may perform the following duties:

Broadcast duties as may be assigned from time to time by the Company, subject to all of the provisions of this Agreement.

*Producers*

Primary Duties:
Prepare the news desks for Anchors and Audio Journalists to broadcast over the air and to transmit and/or record for the Internet (including, but not limited to, blogs and podcasts).

Research, identify and contact daily newsmakers and event participants to schedule and/or conduct interviews.
Contact stringers and bureau desks to schedule coverage and interviews.

Open and distribute all incoming mail for newsroom.

Work on "special projects" when assigned by News Director.

Submit programming ideas to News Director.

Research, compile, produce and distribute network's morning radio news prep sheet (the "Show Props").

Perform administrative tasks and other tasks related to preparation and delivery of news programs as assigned by the news director. The Company retains the discretion to fill or not to fill the producer position, and to change

the producer's duties, subject to the provisions of Sections 2, 3 and 4 of this Schedule II. However, maintenance or engineering duties will not be required.

B.    **OUT OF CATEGORY WORK**

When a covered employee is assigned secondary duties, as permitted above, he or she will be paid at the higher category rate of pay for any hour in which said duties are performed. No covered employee will be paid less than his/her category rate of pay for out-of-category work.

No employee will be assigned to more than one category of work at one time. Except for bona fide news emergencies, covered employees performing work as newspersons shall not be required to simultaneously operate the board.

It is understood and agreed that the news programs require adequate preparation time, including the time spent in gathering, writing and editing news stories. It is understood that any newsperson coming on duty before 8:00 a.m. shall have one (1) hour preparation time. It is understood that any newsperson coming on duty after 8:00 a.am shall have forty five (45) minutes preparation time.

When out-of-category work increases an employee's workload to the point where s/he is unable to utilize the required preparation time, the employee shall be paid time and one half for that applicable one (1) hour or forty-five (45) minute period. An employee's workload is increased if, as a result of out-of-category work, s/he has not had at least forty-five (45) minutes (one (1) hour before 8:00 a.m.) of preparation time during the sixty (60) minutes preceding each newscast s/he broadcasts. SBN reserves the right, however, to negotiate any such extra amount into the individual's compensation, so long as such compensation exceeds the minimum set forth in the collective bargaining agreement. (See Sideletter #5)

An employee whose out of category work exceeds 50% of his/her total hours worked during any three consecutive calendar months shall be deemed to have been promoted to the higher category, unless the higher category work was performed while working as a temporary replacement for an employee off work on temporary leave of absence.

C.    **OTHER DUTIES.**   From time to time, an employee may be asked or required to perform a duty that is outside his/her regular work function. The Company agrees to keep such instances to a minimum and will work to avoid any extreme situations.

**SECTION 2.**        **MINIMUM BASE SALARY**

(a)    The Company agrees to provide all covered employees a 3% increase each year of the contract with the effective date of the Agreement. In order to be eligible for the 3% increase, the employee must have at least one full year of

service with the Company as of the effective date of the Agreement. If the employee does not have at least one full year of service by the effective date of the Agreement, then the employee must wait until his/her first anniversary date to receive his/her 3% raise for that first year. Thereafter, the employee will receive 3% raises on second and third anniversary dates of the effective date of the Agreement.

| Years of Service | Effective Nov. 8, 2016 | Effective Nov. 8, 2017 | Effective Nov. 8, 2018 |
|---|---|---|---|
| **Newspersons** | | | |
| 1 | $49,068 | $50,540 | $52,056 |
| 2 | $50,513 | $52,029 | $53,590 |
| 3 | $51,934 | $53,492 | $55,096 |
| 4 | $52,022 | $53,583 | $55,190 |
| 5 | $54,800 | $56,444 | $58,137 |
| 10 | $64,827 | $66,772 | $68,775 |
| | | | |
| **Audio Journalists** | | | |
| 1 | $28,009 | $28,849 | $29,715 |
| 2 | $28,724 | $29,585 | $30,473 |
| 3 | $29,442 | $30,325 | $31,235 |
| **Producers** | | | |
| 1 | $37,678 | $38,809 | $39,973 |
| 2 | $39,111 | $40,284 | $41,493 |
| 3 | $40,284 | $41,493 | $42,738 |

(b)    Annual three percent (3%) increases shall also apply to fees for voicers, wraps, and television news inserts.

(c)    Notwithstanding the foregoing, the Company shall have the right to hire newspersons for a three (3) consecutive month probationary period, during which time they will receive eighty (80%) of the appropriate starting rate set forth in subparagraph (a), above.

(d)    The probationary rate for Audio Journalists shall be 90% of the full rate.

(e)    Television news inserts will be compensated at a level of $21.90 per hour with a daily cap of $65.00. These news inserts/service exclude Internet transmissions and recordings and are basically televised images and sounds of normal SBN radio programming and will not be produced exclusively for television. Also, the news services at this rate can appear only on a single TV

8

station or network, unless otherwise approved by management. Television news inserts can be provided for the Company's Internet activities at no additional cost as long as such inserts are not produced exclusively for television.

## SECTION 3.  NON-BROADCAST DUTIES

When a covered employee hereunder performs non-broadcast duties for the Company other than those specified herein or normally performed by newspersons, audio journalists or producers, the compensation for such extra duties shall be subject to individual negotiations with the Company except as otherwise provided regarding the Company's Internet activities including, but not limited to, blogs and podcasts.

## SECTION 4.  FREELANCE EMPLOYEES AND STRINGERS:

(a)     Freelance employees are those who perform work for the Company described in Schedule II Section 1. A., but on other than a regular hourly basis, such as per program or per event. Freelance employees shall be paid at an hourly rate that is not less than the straight time hourly rate paid to first year regular part-time employees, or a fee equal to four (4) hours pay at that same hourly rate, whichever is greater. Freelance employees will not be covered by any other provisions of the Agreement unless or until they work greater than twenty-six (26) weeks in any calendar year. Thereafter, they shall be covered by Schedule I, Section 3, Union Membership and Schedule I, Section 14, AFTRA Health and Retirement, but they shall not be covered by any other provision of the Agreement.

(b)     In no event shall this Agreement be construed as being applicable to independent contractors or stringers (for the purpose of this Agreement, stringers shall be defined as individuals who, as independent contractors, furnish services on news stories on a per story or other fixed charge basis) or to employees of affiliates.

(c)     Commercials – Commercials will not be produced by the Company without an agreement with the Union on compensation for covered employees, provided that the Company is always free to produce commercials for its own air at the employee's regular hourly rate.

## SECTION 5.  PART-TIME

The Company may employ part-time newspersons, audio journalists and producers under the following terms and conditions:

(a)     Part-time newspersons, audio journalists and producers may be employed not less than a minimum of four (4) hours on any work day;

(b)     Part-time newspersons, audio journalists and producers shall be entitled to all right of a full-time covered employee under this contract provided, however, as to sick leave, vacation, and termination severance benefits, he/she shall be

9

entitled only to such rights in the same proportion that his/her actual average hourly employment per week bears to forty (40) hours per week; and

(c)     Part-time newspersons, audio journalists and producers shall not be employed in such a manner as to obviate the employment of a full-time newsperson, audio journalist or producer.

## SCHEDULE III - WORKING CONDITIONS

### SECTION 1.     WORK WEEK AND WORK DAY

The regular work week of full-time covered employees shall consist of not more than forty (40) hours in five (5) consecutive days including broadcasts and Internet activities (including, but not limited to, blogs and podcasts) and adequate preparation time, and time spent traveling to and from studio to any assignment (exclusive of traveling to and from the individual's home and the studio). All hours worked in excess of eight (8) consecutive hours in one day or
forty (40) hours in any given week shall be paid at time and one-half (1 1/2) the applicable hourly rate of the covered employee. Overtime shall not be pyramided. All work covered under this Agreement, or any other Agreement between the parties, for any subdivision of Sheridan Broadcasting Corporation, shall be included in the work week of a covered employee.

Newspersons working within the period 12 midnight to 6 AM shall receive, in addition to their weekly salary, additional compensation of ten (10) per cent of the regular hourly rate of pay for the hours worked in such a period.

Newspersons working as on-air news anchors may leave the premises after the last assigned newscast, as has been past practice, except in case of emergency.

Newspersons working as a sport-exclusive employee may be waived from the provisions of the eight (8) consecutive hour work day and, may be assigned a split shift comprising eight (8) hours for sport duties only. Assignments shall not be in excess of two (2) four-hour shifts per work day (such as 6AM – 10AM and 2PM – 6PM, etc.). Each shift shall include a fifty (50) minute preparation period at the start of the shift. All hours in excess of four (4) hours on any shift or eight (8) hours in any work day shall be deemed consecutive to the nearest such shift and shall be compensated on the basis of time and one-half.

Where such sports-exclusive employee does not work a split shift, all hours in excess of eight (8) consecutive hours shall be compensated on the basis of time and a half.

Notwithstanding the foregoing, any work performed by any employee in excess of forty (40) hours must be approved in advance by employee's Company supervisor, including work directly or indirectly related to the Company's Internet activities (including, but not limited to, blogs and podcasts).

10

**SECTION 2.** **DAYS OFF**

A covered employee who is called in to work on either of his/her days off during a week shall be entitled to payment at the rate of time and one-half his/her applicable rate for five and one-half (5 1/2) hours or for the hours actually worked, whichever is greater.

**SECTION 3.** **EXPENSES AND TRAVEL**

Covered employees shall be reimbursed for all reasonable and authorized out-of-pocket expenses incurred in the performance of their assigned duties.

Air travel shall be in accordance with the Company's prevailing policy for management personnel.

On each occasion when the covered employee, with the consent of the Company, uses his/her car in connection with traveling outside the locality, with the knowledge and consent of the Company, s/he shall be reimbursed at a mileage rate consistent with company policy for such business purposes.

**SECTION 4.** **MEALS**

Newspersons shall have the right to eat on the job, away from the newsroom and/or out of the building, as long as their newscasts are covered. Producers and audio journalists shall have the right to eat on the job, but may leave the premises only when a backup audio journalist or other suitable production person is available. Breaks and leaving the premises shall be with the consent of the senior management person present or, in his/her absence, with the consent of the anchor newsperson. Producers and audio journalists may fill in for one another under those circumstances with no effect on wage rates for either employee.

**SECTION 5.** **REST BETWEEN STAFF STRETCHES**

No staff assignment shall begin sooner than eleven (11) hours after the conclusion of the employee's last staff assignment on the preceding day. Where a covered employee is required to work during this eleven (11) hour period, overtime at the rate of time and one-half (1 1/2) shall be paid to him/her for all hours worked within that eleven (11) hour period.

**SECTION 6.** **NOTICE OF STAFF STRETCH**

At least five (5) days' notice must be given to covered employees of any changes to the start or end of their staff stretch, except where the change is due to an emergency or other unforeseen circumstance. If such notice is not given, the affected employee shall be paid at the rate of time and one-half (1 1/2) the applicable rate for all hours worked in violation of this paragraph.

**SECTION 7.** **OFF-PREMISES WORK**

If an artist, for their own convenience, decides to do an approved amount of Internet work off premises, such time is compensable but will not be subject to the minimum call, rest period, or schedule change provisions. Such work is at the artist's discretion and shall not be assigned by the company.

If no artist is available to post finished content to the Internet, the Company may use an employee not covered under this Agreement to post said content. The Company agrees that it shall not assign an employee not covered by the Agreement to perform any other Internet work covered under this Agreement and shall not assign non-bargaining unit employees to post content to the Internet in a manner that would obviate the employment of any covered employee.

## SECTION 8.     VACATIONS

Employees shall accrue vacation during the year prior to which it is taken. ON their anniversary dates of hire, the employees shall earn and have available to them the following vacation:

| Complete Years Of Service On Anniversary Date | Weeks of Vacation Available |
|---|---|
| One through Four | Two Weeks |
| Five through Nine | Three Weeks |
| Ten or More | Four Weeks |

All employees shall also be entitled to an additional week plus four days of vacation in lieu of holidays. These vacation days must be taken during the anniversary year in which they become available.

Vacation not taken during the year it is available may only be carried over into the following year if the employee's request to use such time has been denied by the Company.

Employee vacation requests for April through September of each calendar year shall be made no later than March 15. Requests for October through March should be made no later than September 15. Timely vacation requests will not be denied provided that the Company is able to schedule adequate staffing and can otherwise meet its business needs. Conflicts among timely requests which would affect the Company's ability to schedule adequate staff will be resolved by seniority.

Vacation requests that are not submitted in a timely manner will be considered only after all timely requests have been considered. Untimely requests may be granted provided that the Company is able to schedule adequate staffing and can otherwise meet its business needs. Conflicts among untimely requests will be resolved at the discretion of the Company based on reasonable business reasons.

## SECTION 9.     SICK LEAVE/PERSONAL LEAVE/BEREAVEMENT LEAVE

Each newsperson, audio journalist and producer shall be credited with ten (10) days of sick leave on January 1 of each year. Any newsperson, audio journalist or producer hired after January 1 of the current year shall accrue one (1) day's paid sick leave for each full month of work during the remainder of the year, not to exceed a total of ten (10) days for that year.

A newsperson, audio journalist or producer who is hospitalized or confined to the home as a result of a serious illness or accident shall be extended an additional ten (10) days paid sick leave per year upon receipt by the Company of an appropriate physician's certification.

The Company may require a physician's verification of illness where such illness or injury results in the employee missing three or more days of work, or where the sick days being used by the employee form a recurring pattern.

Sick leave cannot be accrued and accumulated from year to year. Moreover, if an employee leaves the employment of the Company, s/he shall forfeit all right to further time off or pay in lieu of time off based upon any accumulated sick leave.

Two (2) accrued sick days per year may be used as personal time off for legitimate business reasons. Prior approval of the Company must be obtained before taking those days. Such approval shall not be unreasonably denied.

An employee may designate as "bereavement leave" up to three (3) days of paid sick leave per calendar year and may take such leave in increments of not less than a full day. If the employee is out of paid sick leave, s/he may use paid vacation in increments of not less than a full day. If an employee needing to take time off due to bereavement is out of paid sick leave and paid vacation, s/he may take off without pay up to three (3) days in increments of not less than a day. Under this Section, bereavement leave shall be used in the event of death of an immediate family member (i.e., employee's parent, sibling, child, or spouse and employee's spouse's parent, sibling, child, or near relative).

## SECTION 10.  TERMINATION AND SEVERANCE PAY
### (a)  TERMINATION:

Covered employees shall receive written notice of termination or pay in lieu of notice in the event his/her employment is terminated as follows:

| Years of service | Written Notice or Pay in Lieu of Notice |
|---|---|
| 0 – 3 | 2 Weeks |
| 4 – 5 | 3 Weeks |
| 6 and thereafter | 4 Weeks |

Provided, however, that termination for gross insubordination, gross misconduct or violation of the Substance Abuse Policy shall be cause for immediate termination without notice or pay in lieu of notice.

(b)     SEVERANCE PAY:

Covered employees terminated shall receive severance pay as follows:

| Years of Service | Severance Pay |
|---|---|
| 0 – 3 | 1 week for each year |
| 4 – 5 | 1 1/2 weeks for each year |
| 6 and thereafter | 2 weeks for each year |

The maximum amount of accruable severance pay shall be twenty-six (26) weeks. Provided, however, that termination for gross insubordination, gross misconduct, or violation of the Substance Abuse Policy shall be cause for immediate termination without severance pay.

(c)     PROBATIONARY EMPLOYEES:

Notwithstanding the foregoing, in the event of termination, probationary employees shall be entitled to forty-eight (48) hours' notice and one (1) week's pay provided they fulfill the qualifications for such notice of pay contained in paragraph (a) hereof.

(d)     A terminated employee shall receive accrued and earned vacation pay.

## SECTION 11.     COMBAT ZONE PAY

A covered employee sent by the Company on an assignment covered hereunder to an officially recognized combat zone shall be paid an additional $100.00 for each such week, which sum shall be in addition to his or her normal compensation.

Provided, however, each such assignment to a combat zone shall be subject to terms and conditions negotiated between the Company and the covered employee, but not less than the increment specified in the above paragraph.

## SECTION 12.     NEWS PROGRAMS AND INSERTS MADE AVAILABLE TO OTHER NETWORKS AND STATIONS

If a covered employee obtains a news story or insert on which his or her voice is hears, and the Company decides to make the news story or insert available, for a fee, to another network or non-affiliate, the Company must pay the employee a fee equal to or greater than one (1) hour of pay at the employee's regular hourly rate. No fee shall be paid for news stories or inserts made available by the Company, at no charge, to another network or affiliate. In addition, no fee or charge shall be paid for news stories or inserts made available by the Company on its website or made available by the Company for websites not owned by the Company.

## SECTION 13.     RELOCATION EXPENSES

A covered employee who is relocated by the Company shall be reimbursed for his/her relocation expenses, as negotiated with the individual. The resulting

agreement will be submitted to the Union for review, and the Company's decision shall be subject to the grievance-arbitration procedure of this Agreement. Relocation expenses are defined as the moving of furniture and household goods.

**SECTION 14.  NON-WAIVER OF RIGHTS**

The acceptance by a covered employee for any work or services under this Agreement of payment or other consideration in moneys by check or in any other form, shall not be deemed a waiver by such covered employee, and shall not constitute a release or discharge by him/her of such covered employee's rights either under this Agreement or under any agreement subject to this Agreement for additional compensation or of his/her contractual rights. Releases, discharges, notation on checks, cancellations, etc., and similar devices which may operate as waivers or releases shall be null and void to the extent provided for above unless AFTRA's prior written approval is first had and obtained.

**SECTION 15.  TERM OF AGREEMENT**

This Agreement shall be effective November 8, 2016 for a term of three (3) years. Beginning at least sixty (60) days prior to the expiration hereof, SAG-AFTRA and the Company will begin negotiations in good faith with respect to a new contract.

**SECTION 16.  OUTSIDE EMPLOYMENT**

No employee in the unit affected by this Agreement may perform work, paid or unpaid, for any electronic or news medium (including an Internet website or Internet news medium), or take a job with any other employer without the Company's prior written permission. It is agreed that permission shall
not be unreasonably denied by the Company. Permission may be withdrawn upon two (2) weeks' notice where the Company determines, after discussion with the employee involved and SAG-AFTRA, that the work interferes with the employee's work for the Company or the Company's business. Additional time may be granted when necessary for the employee to divest him/herself of these additional responsibilities. Such extension shall not be unreasonably denied by the Company. In no event shall such extension exceed two (2) months after the original notification.

Requests for permission to perform such work or take any such job shall be made in writing with the full details and shall be delivered to the President of the Company. The employee shall be entitled to a response within twenty-four (24) hours after receipt by either of the listed management or their personal secretary, where the job in question is a one-time opportunity to do a commercial, tape or film narration, and to a response within two (2) weeks after receipt by either of the listed management or their personal secretary for any other type of work.

**SECTION 17.  NAME OF AGREEMENT**

This Agreement shall be known as the SAG-AFTRA-SHERIDAN BROADCASTING NETWORKS AGREEMENT of 2016-2019, and it shall be binding upon and inure to the benefit of SAG-AFTRA and the Company, and their respective successors and assigns.

15

IN WITNESS WHEREOF, the parties hereto have signed this Agreement below, intending to be legally bound hereby.

SAG-AFTRA
Ohio-Pittsburgh Local

By: _____
Brian Lysell
Executive Director

SHERIDAN BROADCASTING NETWORKS
Employer

By: _____
Ronald R. Davenport, Jr.
General Counsel

RATIFIED AND COUNTERSIGNED:

SAG-AFTRA

By: _____
Mary Cavallaro
Chief Broadcast Officer

16

**Sideletter #1**

As of November 25, 1992

SAG-AFTRA
Ohio-Pittsburgh Local
625 Stanwix Street, Suite 2007
Pittsburgh, PA 15222

While Sheridan Broadcasting Networks ("SBN") is the majority partner in American Urban Radio Networks ("AURN"), there will be no required payment of fees pursuant to Schedule II, Paragraph (B) for programming produced for and broadcast on AURN affiliates.

Should SBN discontinue its relationship with or become a minority shareholder in AURN, this waiver will be rescinded.

Very Truly Yours,

SHERIDAN BROADCASTING NETWORKS

Ronald R. Davenport, Jr.
General Counsel

Accepted and Agreed:

SAG-AFTRA
Ohio-Pittsburgh Local

Brian Lysell
Executive Director

As of November 25, 1992

SAG-AFTRA
Ohio-Pittsburgh Local
625 Stanwix Street, Suite 2007
Pittsburgh, PA 15222

Notwithstanding the provisions of Schedule III, Paragraph 9, subparagraphs A and B (termination and Severance Pay) covering newspersons, audio journalists and producers, all covered employees employed as of November 25, 1992 shall be entitled to four (4) weeks' pay in lieu of notice in the event his/her employment is terminated by the Company, absent cause described in Subparagraph A.

In addition, all covered employees employed as of November 25, 1992 shall be entitled to severance pay on the basis of two (2) weeks' salary for each year of employment, with a maximum of twenty-six (26) weeks.

Very Truly Yours,

SHERIDAN BROADCASTING NETWORKS

Ronald R. Davenport, Jr.
General Counsel

Accepted and Agreed:

SAG-AFTRA
Ohio-Pittsburgh Local

Brian Lysell
Executive Director

March 30, 2007

SAG-AFTRA
Ohio-Pittsburgh Local
625 Stanwix Street, Suite 2007
Pittsburgh, PA 15222

Re:    Sheridan Broadcasting Networks/ SAG-AFTRA Negotiations and Internet
       Broadcasts

The parties agree that the Employer may use broadcast programming material, live or
recorded, on the Employer's Internet Web Sites; may offer such material to others; and may assign
bargaining unit employees to perform services for the Employer's Internet Web Sites without
payment of additional compensation. Such services and material shall include, but not be limited to,
blogs and podcasts. In addition, the Employer may use visual images of bargaining unit employees
engaging in the aforementioned services or providing the aforementioned material regardless of
whether such services or material are using in broadcast programming.

The Employer agrees that all announcers and performers hired by the Employer to provide
Internet broadcast services produced by the Employer shall be subject to the provisions of this
collective bargaining agreement.

If an artist, for their own convenience decides to do an approved amount of Internet work
off premises, such time is compensable but will not be subject to the minimum call, rest period or
scheduling provisions of the Agreement. Such work is at the artist's discretion and shall not be
assigned by the company.

Sincerely,

Ronald R. Davenport, Jr.

Accepted and Agreed:

SAG-AFTRA
Ohio-Pittsburgh Local

Brian Lysell
Executive Director

As of February 1, 2007

SAG-AFTRA
Ohio-Pittsburgh Local
625 Stanwix Street, Suite 2007
Pittsburgh, PA 15222

During negotiations of the 2013-2016 SAG-AFTRA-SHERIDAN BROADCASTING
NETWORKS AGREEMENT, the Company and SAG-AFTRA agreed to the following language:

> "SAG-AFTRA will permit the use of audio journalists and producers to conduct telephone
> interviews with newsmakers, such interviews to include "voicers" and "wraps".
>
> It is further understood that any "voicer" or "wrap" by an audio journalist or producer may
> be used within a regular SBN newscast and/or Company owned web platform delivered by
> an SBN newsperson covered by the SAG-AFTRA/SBN collective bargaining agreement.
>
> Payment for such work shall be a minimum of $10 per "voicer" and $40 per "wrap" based
> on usage, and paid monthly.
>
> In addition, SBN shall maintain a log of all such material including title of interview, date,
> and name of audio journalist, and shall make such log available to SAG-AFTRA upon
> request."

Very Truly Yours,

SHERIDAN BROADCASTING NETWORKS

Ronald R. Davenport, Jr.
General Counsel

Accepted and Agreed:
SAG-AFTRA
Pittsburgh Local

Brian Lysell
Executive Director

As of November 25, 1992

SAG-AFTRA
Ohio-Pittsburgh Local
625 Stanwix Street — Suite 2007
Pittsburgh, PA 15222

The Company hereby agrees that it will use its best efforts to notify the Union anytime that an SBN employee is hired into the bargaining unit under an overscale individual employment contract, where such overscale payments are to be credited towards payment for out-of-category work pursuant to Schedule II, Section 1.B. The Company will provide the Union a copy of an overscale individual employment contract upon request.

Very Truly Yours,

SHERIDAN BROADCASTING NETWORKS

Ronald R. Davenport, Jr.
General Counsel

Accepted and Agreed:

SAG-AFTRA
Ohio-Pittsburgh Local

Brian Lysell
Executive Director

## Appendix A

## SUBSTANCE ABUSE POLICY

### A. INTRODUCTION

As part of the 2003 bargaining discussions, SAG-AFTRA and SBN reached an agreement on the following drug testing policy:

1. Substance abuse poses a serious threat to employees, coworkers and the Company. We have a duty to ourselves, our families, our clients and customers and our listening public to do everything we can to eliminate the use of illegal substances and the abuse of legal substances, both by action and by example. The Company and SAG-AFTRA have therefore agreed to this Substance Abuse Policy. It is agreed that both parties intend this policy to be preventative before being punitive.

### B. ILLEGAL SUBSTANCES

1. Any employee who engages in the creation, manufacture, distribution, dispensing, possession or use of an illegal substance, whether on or off Company premises, is subject to disciplinary action up to and including immediate termination.

2. Any employee convicted of any criminal drug statute violation during the employee's employment with the Company will be terminated.

### C. ABUSE AND ILLEGAL USE OF LEGAL SUBSTANCES

1. Any employee who engages in the illegal distribution, dispensing, possession or use of an otherwise legal substance or the abuse of such a substance while on Company premises or during working time is subject to disciplinary action, up to and including immediate termination. Some examples including using someone else's prescription drugs, sniffing glue or giving your prescription drugs to another person for their use.

### D. POSSESSION, DISTRIBUTION, USE, AND BEING UNDER THE INFLUENCE OF ALCOHOL

1. Except where prior express approval has been granted by the Company, any employee who has a blood level of 0.07% or greater or who engages in the possession, distribution, dispensing or use of alcohol on Company premises, or while performing work for the Company, is subject to disciplinary action up to and including immediate termination. Where use of alcohol on Company premises or while performing work for the Company off the Company's premises (such as clubs, concerts, etc.) has been approved by the Company in advance of such use, employees are nonetheless prohibited from having a blood alcohol level that equals or exceeds 0.07%.

## E. TESTING/EAP TREATMENT PROGRAM

1.    All new employees may be tested, either prior to or immediately after beginning work for the Company, for the use of illegal substances and the abuse of legal substances.

2.    All current employees, and those hired thereafter, both management and non-management, are also subject to testing for the use of illegal substances and abuse of legal substances and the use of alcohol.

3.    If management at any time has a reasonable suspicion that an employee is or may have been using an illegal substance, illegally using legal substances or is using or possessing alcohol in violation of this policy, it may require him/her to submit to testing.

The Company's reasonable suspicion must be based on specific, objective facts and reasonable inferences drawn from these facts. Examples include, but are not limited to, observation of substance abuse and/or the physical symptoms of being under the influence of any prohibited substance in a pattern of abnormal conduct or erratic behavior or reports of such conduct or behavior.

4.    In the event that an employee tests positive, the employee must immediately enter and successfully complete a treatment program through the AIPADA employee assistance program ("EAP"), which is part of the AFTRA Health and Retirement plan, subject to the following conditions:

- The Company is made aware of the treatment program.

- The employee authorizes the treatment facility to provide progress and end of treatment reports to the Company.

- The treatment facility provides such reports to the Company.

- The employee successfully completes the short-term treatment program, as determined and certified by the treatment facility.

- The employee shares with the Company the specifics of his/her long-term treatment program.

- The employee stick with his/her long-term treatment program, and provides appropriate reports of his/her adherence to the program.

- For a period of not more than twenty-four (24) months after an employee's return to work, the employee submits to testing as required by the Company. During the twenty-four (24) month period, the Company may require no more than six (6) times that an employee submit to testing where the Company does not have a reason to believe that the employee is or may have been impaired.

23

- The employee does not re-engage in substance abuse. There will be no second chances.

5.     An employee may opt to forego being tested and immediately enter the above EAP treatment program. However, this option is available only to employees who, while working for the Company, have not previously tested positive or previously entered an EAP treatment program for substance abuse.

6.     The Union has expressed its concern that the Company could use testing in bad faith for harassment purposes or that it could order testing to occur based on information that is not reliable. For the sole purpose of addressing these concerns, the Company agrees to the following safeguards. After testing has occurred, the Union may make a written request that the Company provide the Union with the information that caused the Company to suspect that the employee who was tested was under the influence of a prohibited substance. If the Company's suspicion is confirmed by the personal observations of a Company manager, the Company will be required to provide the Union with only information regarding the manager's observations. If the Company's suspicions are not confirmed by a manager's personal observations, upon a written request by the Union, the Company will provide the Union with a summary of the information upon which the Company based its suspicion. The Company agrees that it will not rely on information submitted to the Company anonymously unless such information is verified by personal observations or by some other reasonably reliable verification. This paragraph shall no apply in the event that an employee opts to enter an EAP treatment program instead of being tested. Nothing in this paragraph shall be construed to in any way limit the Company's ability to discipline or terminate an employee under this Policy.

F.     DISCIPLINE

1.     An employee who tests positive and successfully completes an EAP treatment program or an employee who foregoes being tested and successfully completes an EAP treatment program shall not be subject to discipline based upon the employee's agreement to enter a treatment program and/or the employee's suspected abuse prior to entering the program. An employee will be terminated upon a second occurrence of testing positive or otherwise violating this Policy or upon testing positive or otherwise violating this Policy at any time after completing a treatment program, and will not be entitled to receive severance benefits under the contract.

2.     This Policy shall not be construed as limiting in any way the Company's right to discipline or terminate an employee for violating any Company work rule. Being under the influence of a prohibited substance shall not be an excuse for a work rule violation.

3.     An employee shall not be permitted to refuse the Company's instructions to be tested, delay testing or fail to immediately enter a treatment program because the employee or Union disputes the Company's reasonable suspicion determination. Any employee or applicant

Who refuses to submit to testing for whatever reason, or who dials to take the test as scheduled or directed by the Company, or who fails to immediately enter into an EAP treatment program pursuant to this Policy, will be considered to have voluntarily terminated his/her employment or withdrawn his/her application for employment, effective immediately.

24

4.       Disciplinary action taken under the Substance Abuse Policy is subject to the arbitration procedure, subject to the following conditions:

a.       In the event that an employee is terminated under the Substance Abuse Policy, the only issue that will be subject to the arbitration procedure will be whether the employee is entitled to severance benefits pursuant to Schedule III, Section 9 of the Contract.

b.       In the event that an employee receives discipline other than termination, under the Substance Abuse Policy, the only issue that will be subject to the arbitration will be whether the Company's decision to impose the discipline is the result of the Company's disregard of material provision of the Policy. This provision shall not be interpreted as requiring that the Company must have "just cause" for using discipline under the Policy.

c.       The Substance Abuse Policy shall not be interpreted as restricting in any way the Company's right to discipline or terminate an employee for reasons that are not related to violations of the Policy.

G.       TESTING FACILITY AND CONFIDENTIALITY

1.       The facility chosen to conduct substance abuse tests for the Company has been carefully selected to insure the accuracy of testing and the confidentiality of results. Testing will be conducted by certified personnel and a laboratory accredited by the National Institute on Drug Abuse. Employees will be asked to list the use of any legal substances which may affect the employee's test, such as the legal use of prescription drugs. If the first test shows a positive result indicating substance abuse, a second test will be conducted on the same sample. Only if both tests show a positive result will that result be reported to the employee and to the Company. The Medical Review Officer for the facility may determine that there is a legitimate explanation for a positive test result, and the test shall be reported as a negative test result.

2.       The testing facility will maintain records pertaining to the employee's test in the strictest of confidentiality, and will discuss the employee's test results only with the employee and/or designated Company representatives. The testing facility and/or Company will discuss with or disclose to a representative of the Union an employee's test results only after the employee has executed an appropriate authorization.

3.       The Company will keep employees' test results confidential, treating them the same as other medical records and disseminating that information only on a need-to-know basis, pursuant to government inquiry or court order or as otherwise may be required by law.

## H. POSITIVE RESULTS

1. For the purpose of this Substance Abuse Policy, whether an employee has "used" a legal or illegal substance and whether the employee has a "positive" testing result shall be determined as follows:

a. Testing reveals the presence of alcohol, an illegal drug or a drug metabolite in an employee's system, at levels equal to or greater than the levels specified below for the confirmation test:

|  | Initial Test Levels | Confirmation Test Levels |
|---|---|---|
| alcohol | 0.07% | 0.07% * |
| marijuana metabolite | 50 ng/ml | 15 ng/ml ** |
| cocaine metabolite(s) | 300 ng/ml | 150 ng/ml *** |
| morphine and/or codeine | 300 ng/ml | 300 ng/ml |
| phencyclidine (PCP) (and/or metabolites) | 25 ng/ml | 25 ng/ml |
| amphetamine and/or methamphetamine | 1000 ng/ml | 500 ng/ml |
| oxazepam and/or other benzodiazepine or metabolite | 300 ng/ml | 300 ng/ml |
| barbiturates | 300 ng/ml | 200 ng/ml **** |
| methadone and/or metabolite | 300 ng/ml | 300 ng/ml |

\* percent blood alcohol level
\*\* delta-9-tetrahydrocannabinol-9-carboxylic acid
\*\*\* benzoylecgonine, ecgonine methyl ester, and/or ecgonine
\*\*\*\* amobarbital, butabarbital, butalbital, pentobarbital and/or secobarbital

b. Where an employee has been given permission by the Company in advance to use alcohol on Company premises or while performing work for the Company off the Company's premises, "use" or a "positive" test result for alcohol shall mean that confirmation testing reveals the presence of alcohol that is equal to or greater than 0.07%.

2. At an interview conducted by a manger or supervisor of the Company and in the presence of a SAG-AFTRA representative, the employee will be given an opportunity to explain and substantiate his/her proper use of legal drugs (prescription or over the counter) or alcohol which may have resulted in a positive test result or to provide any evidence that may exist to confirm that the positive test was not the result of use of illegal drugs.

## I. USE OF VACATION AND SICK LEAVE

1. Employees may use paid sick leave and vacation while participating in an EAP treatment program pursuant to this Policy.

## J.     IMPLEMENTATION POLICY

1.     Employees will not be subject to the testing provisions of this Substance Abuse Policy until three (3) calendar months after the Policy has been implemented.

**EXHIBIT 2**

# VOLUNTARY LABOR ARBITRATION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| | \* |
| | \* FMCS CASE NO. 17-54919 |
| **SHERIDAN BROADCASTING NETWORKS** | \* |
| | \* |
| **-AND-** | \* |
| | \* |
| **SCREEN ACTORS GUILD-AMERICAN FEDERATION** | \* |
| **OF TELEVISION and RADIO ARTISTS** | \* |
| | \* |
| | \* |
| | \* |
| | \* |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**GRIEVANCE(S) ALLEGING SIX (6) VIOLATIONS OF THE PARTIES' 2016 TO 2019 COLLECTIVE BARGAINING AGREEMENT AS SET FORTH HEREINAFTER**

## AWARD OF ARBITRATION

**DENNIS E. MINNI, ESQ., NAA**
**ARBITRATOR/MEDIATOR**
**13500 PEARL RD.**
**SUITE 139 NO. 104**
**STRONGSVILLE, OH 44136**

**Issues Presented:**

(1) The Company has failed to give bargaining unit employees employed as of August 29, 2017, notice of the termination of their employment as required under Schedule III, Section 10 of the CBA and has further failed to give said employees pay in lieu of notice as required under Schedule III, Section 10 of the CBA.

(2) The Company has failed to pay severance pay to bargaining unit employees employed as of August 29, 2017, which severance pay as (*sic*) required (*sic*) Schedule III, Section 10 of the CBA.

(3) The Company failed to timely implement the November 8, 2016 three per cent (3%) increase in wages required under Schedule II, Section 2(a) of the CBA, and has failed to make employees whole for its untimely implementation.

(4) The Company has failed to pay bargaining unit employees for time worked and worked (*sic*) performed prior to SBN's shutdown on August 29, 2017.

(5) The Company has failed to pay bargaining unit employees for out-of-pocket expenses incurred in the performance of their assigned duties.

(6) The Company has failed to remit to SAG-AFTRA dues that it has deducted from bargaining unit employees' paychecks.

**(FURTHER)**

(7) SAG-AFTRA reserves the right to raise additional claims as they may come to light.

**Date Of Hearing:** November 20, 2017

**Situs Of Hearing:** 625 Stanwix St., Pittsburgh, PA 15222

**Employer Representatives And Witnesses:**

1. Ronald Davenport, Jr., Esq.,..........................Sheridan Broadcasting Networks  Attorney

**Union Representatives And Witnesses:**

1. Brian Lysell, Esq.,.............................................SAG-AFTRA Legal Counsel

## BACKGROUND INFORMATION

This matter came on for hearing on November 20, 2017 in Pittsburgh, PA at the offices of the Union formally the Screen Actors Guild-American Federation of Television & Radio Artists (AFL-CIO) hereafter "SAG-AFTRA" or the "Union" before the undersigned.

Said Union represents a bargaining unit of employees of the Employer, Sheridan Broadcasting Networks, hereafter "SBN", the "Employer or the "Company".

Said employees, whether full-time, part-time or temporary are represented by SAG-AFTRA and are consolidated into a bargaining unit in the greater Pittsburgh, PA area based as of the date of this hearing at 960 Penn Avenue 3rd Floor in Pittsburgh.

Said Union is the voluntarily recognized or NLRB certified representative for purposes of collective bargaining between the Employer and the Union.

Said parties SAG-AFTRA and SBN are signatories to a labor agreement ("CBA") entered into the record as Joint Exhibit 1 ("JX-1"). This CBA's duration is from November 8, 2016 to November 7, 2019.

The parties stipulated that the grievance was properly in arbitration and ripe for final and binding determination in accordance with their CBA. Further, the undersigned notes that Section 11 of the CBA provides the following limitation on the authority of selected neutrals:

"The arbitrator shall only have the authority to interpret compliance with the provisions of this Agreement, and shall not have authority to add to, subtract from or alter in any way the provisions of this Agreement. The decision of the arbitrator on any issue properly before him/her

shall be final and binding upon the Company, the Union and the employee or employees involved. The cost of arbitration, including the salary and expense incident to the services of the arbitrator, shall be shared equally by both parties."

There were no specific joint or party exhibits adduced to record at the hearing but the parties did enter into stipulations of fact along with four (4) exhibits ("A"-"D") which are incorporated by reference hereto with coopies appended to this award.

Summarily, the pre-hearing submitted exhibits are:

"A": a copy of the 2016-2019 CBA noted *supra;*

"B": a list of bargaining unit members (Cohill; Cook; Griffin; Harris; James; Johnson; Jones;

Lampkins; Miller; Smith & Starkey), their respective hire dates, individual claims for pay in lieu of written notice, individual claims for severance pay and each listed employee has a common termination date listed, to wit: "August 31, 2017";

"C": a list of the same bargaining unit members from Ex. B and claims in various amounts for back-pay in the amount of 3% due from November 8, 2016; wage or salary claims for the pay period August 16, 2017 to August 31, 2017 and back-pay for alleged unpaid "wraps" and/or "voicers" for six (6) of the eleven (11) employees listed;

"D": a computation of the aggregate amount of claims contained in Exhibits B and C plus a $9,088.39 claim for employee April Ryan for clothing allowance & mileage/expenses incurred in her course of employment plus a claim by SAG-AFTRA for $2293.09 for the alleged non-remittance of union dues withheld from bargaining unit members' paychecks.

As for the noted stipulations, they are fifty-one (51) in number and primarily attest to the accuracy of the information set forth in Exhibits B, C, and D. In addition, other stipulated matters attest to the validity of the CBA, the authority of the undersigned and that this grievance is arbitrable both substantively and procedurally.

No additional joint or party exhibits were adduced by the parties nor was a recorded transcript of the hearing taken. Post-hearing briefings were timely filed by both parties as agreed.

The respective major positions of the parties to this dispute are as set forth hereinafter.

## POSITION OF THE UNION:

The seminal point of this dispute occurred with the Employer's unilateral decision to cease or otherwise suspend its broadcast operations in the Pittsburgh, PA marketplace as of August 31, 2016.

The stated claims for the enumerated employees and SAG-AFTRA's dues remittance are accurate and documented as presented herein. As such, they form the basis for this grievance(s), have merit and should be granted as prayed for.

Further, the Union has continued to discharge its collective bargaining responsibilities and has provided representation for its members at all times pertinent herein.

## POSITION OF THE EMPLOYER:

The Employer, in its brief, maintains that there is no contention with the Union's position

on either employee back-pay, fringe benefit claims or the Union's claim for non-remitted withheld dues. SBN's concluding statement states:

> "The Company stipulates to its liability for the amounts referenced above as contained in Joint Exhibit 1 and exhibits thereto"

## DISCUSSION AND ANALYSIS:

The CBA's pledge that the arbitrator's decision shall be final and binding is duly noted Having had the opportunity to appear, present and cross-examine witnesses and issue a post-hearing brief it is clear and convincing that SBN, through its legal counsel, understands its position and the applicability of the mutual stipulations it entered into.

Therefore, said fifty-one (51) stipulated facts and the submitted brief amount to the Employer's *demurrer* to the Union's claims and representations. As such, the Union's claims, being in essence not controverted, have merit and shall be awarded by virtue of sustaining this grievance(s).

In addition, the Employer briefed that it did not withhold union dues for Ms. Caitlyn Starkey, bit did so for the other ten (10) bargaining unit members. However, I do not know if Ms. Starkey paid her dues directly, attempted to tender her dues or otherwise authorize withholding or refused to pay or have them submitted to SAG-AFTRA. Remedially, if this failure to withhold was wilful on SBN's part the Union's claim for Ms. Starkey's non-withheld dues shall be added to this award.

## AWARD OF ARBITRATION:

Based upon the foregoing and the record as a whole, the grievance(s) is/are hereby granted as prayed for. The Union has met its burden of proof and shown by a preponderance of the evidence that it is entitled to the relief sought and thus shall prevail in this award of arbitration as allowed by and through the terms of the parties' CBA.

I shall retain jurisdiction over this matter for ninety (90) days from the date of this award for the sole purpose of assisting the parties with implementation or supplemental administration if either party makes written request to the undersigned.

Respectfully submitted, this 2nd day of February, 2018 at Strongsville, OH

*Dennis E. Minni*

Dennis E. Minni, NAA
Arbitrator-Mediator

-5-

Q All ⌄   Dennis Minni, search your mailbox          Search Mail    Search Web   🏠 Home   👤 Dennis   ⚙

✉  📇  📅  🖼  ✉

✎ Compose          ← ⇤ →   📥 Archive   📁 Move ⌄   🗑 Delete   ⊘ Spam ⌄   ••• 📁⬜Collapse All ↑ ↓ ✕

Inbox (24)
Drafts
Sent
Archive
Spam (317)
Trash (178)
> Smart Views
⌄ Folders (64)
  AAA (3)
  Arbitration Work
  BMW Relate... (3)
  CAP Motors Arbitration
  CREDIT HIST... (6)
  Deleted Items
  DEM Health... (4)
  Employment Arb-Law
  General Files (4)
  JAGUAR STUFF (6)
  LERA-NEO C... (12)
  Mercedes Benz Stuff
  MISC. (2)
  N. Olmsted -... (3)
  NAA
  NutriMost (1)
  NutriSystem (1)
  Sent Items
  SERB (2)
  STAPLES REC... (5)
  SYMPOSIUM (2)
  TAX RECORDS (4)
  Watches (6)
> Recent

## FMCS Case No. 17-0918-5491-9 (5)                                    People

Brian Lysell <Brian.Lysell@sagaftra.org>              📎  11/15/17 at 4:32 PM
To 'Dennis Minni'
CC Ronald Davenport, Jr

Dear Arbitrator Minni

The parties in the above-captioned case met earlier this week to discuss the facts to which we could
agree in advance of our hearing scheduled for November 20, 2017. As a result of those discussions,
the parties have agreed to stipulate to the facts contained in the attached document. SAG-AFTRA
believes that these facts are sufficient for you to conclusively find in favor of the union with respect
to liability and damages on all specifications contained in this grievance and will represent the same
at Monday's hearing.

Should you have any questions or concerns, please do not hesitate to contact me at this address or
on my cell phone: 347-421-0193.

Sincerely,

Brian Lysell
Executive Director
Ohio-Pittsburgh Local
SAG-AFTRA
625 Stanwix Street, Suite 2007
Pittsburgh, PA 15222
T: 412.281.6767    F: 412.281.2444

🎬 **SAG·AFTRA**

⅄

20171115 _.pdf

← Reply    ⇐ Reply to All    → Forward    ••• More

Dennis Minni   Mr. Lysell & Mr. Davenport: -just want to advise that I r   📎 11/16/17 at 9:38 AM

Brian Lysell   Gentlemen, Attached please find the Union's post hearin   📎 11/21/17 at 1:58 PM

Dennis Minni   Mr Davenport, I want to reiterate what was arranged y   📎 11/22/17 at 5:36 AM

Ron Davenport Jr. <rdavenponjr@sbcol.com>              📎 12/04/17 at 3:43 PM
To Dennis Minni
CC Brian Lysell

Arbitrator Minni,
 Attached, please find the Post Hearing Brief for Sheridan Broadcasting Networks.  I understood
there to be six grievances, not seven, and the brief reflects such.  If I am in error, please let me
know.  References in the Sheridan brief are to Joint Exhibit 1 and exhibits attached to the Post
Hearing Brief for SAG-AFTRA.
  If there is anything further that you may require from Sheridan, please don't hesitate to contact
me.

> Show original message



FUEL YOUR
MORNING
UP TO
30% OFF

Save now

# EXHIBIT A

In the matter of FMCS Case No. 170918-54919 ("Grievance"), Sheridan Broadcasting Networks ("SBN") and SAG-AFTRA hereby stipulate to the following facts:

1. The attached Exhibit A is true copy of the 2016—2019 Collective Bargaining Agreement between SAG-AFTRA and SBN ("CBA").

2. SBN is bound by the CBA.

3. SAG-AFTRA is bound by the CBA.

4. SAG-AFTRA has filed the Grievance in a timely manner pursuant Schedule I, Section 11 of the CBA.

5. Arbitrator Dennis E. Minni has jurisdiction over each specification contained in the Grievance.

6. The attached Exhibit B accurately states the employees employed by SBN as of the last date of its operation ("Terminated Employees").

7. Exhibit B accurately states the dates of hire for Terminated Employees.

8. Exhibit B accurately states the dates of termination for Terminated Employees.

9. Schedule III, Section 10(a) of the CBA obligates SBN to give written notice to Terminated Employees of the termination of their employment, or pay in lieu thereof.

10. On August 29, 2017, SBN verbally notified Terminated Employees that their employment would be terminated as of August 31, 2017.

11. SBN terminated the employment of Terminated Employees on August 31, 2017.

12. SBN did not give Terminated Employees written notice of the termination of their employment.

13. SBN did not give Terminated Employees any pay in lieu of written notice of termination of their employment.

14. The amounts of pay in lieu of written notice of termination set forth in Exhibit B are accurate.

15. SBN owes Terminated Employees the amounts of pay in lieu of written notice of termination set forth in Exhibit B.

16. Schedule III, Section 10(b) of the CBA obligates SBN to give terminated employees severance pay, up to a maximum of twenty-six (26) weeks of severance pay.

17. None of the Terminated Employees' employment was terminated for any reason that would disqualify any of them for severance pay under Schedule III, Section 10(b).

18. SBN has not paid Terminated Employees any severance pay.

19. The amount of severance pay owed to each Terminated Employee as set forth in Exhibit B is accurate.

20. SBN owes Terminated Employees severance pay in the amounts set forth in Exhibit B.

21. The CBA obligates SBN to give all bargaining unit employees a three-percent (3%) increase in their actual salaries on November 8 of each year of the CBA.

22. The CBA obligated SBN to implement the first three-percent (3%) increase in actual salaries under the CBA on November 8, 2016.

23. Terminated Employees were all employed in bargaining unit positions on November 8, 2016.

24. SBN did not implement the three-percent (3%) increase in Terminated Employees' actual salaries on November 8, 2016.

25. SBN first implemented the three-percent (3%) increase in Terminated Employees' actual salaries on February 1, 2017.

26. The amount of retroactive pay owed to each Terminated Employee because of SBN's failure to timely implement the November 8, 2016 increase, as set forth in the attached Exhibit C, is accurate.

27. Because of SBN's failure to timely implement the November 8, 2016 increase, SBN owes Terminated Employees retroactive pay for the period November 8, 2016, through January 31, 2017 in the amounts set forth in Exhibit C.

28. When SBN terminated the employment of Terminated Employees, it failed to pay full-time Terminated Employees their salaries for the period August 16, 2017, through August 31, 2017.

29. When SBN terminated the employment of Terminated Employees, it failed to pay part-time Terminated Employees their wages for the period August 16, 2017, through August 31, 2017.

30. The amount of retroactive pay owed to each Terminated Employee on account of SBN's failure to pay salaries or wages due to them, as set forth in Exhibit C, is accurate.

31. Because of SBN's failure to pay salaries or wages due to Terminated Employees, SBN owes Terminated Employees retroactive pay for the period August 16, 2017, through August 31, 2017, in the amounts set forth in Exhibit C.

32. Sideletter #4 to the CBA obligates SBN to pay employees for wraps and voicers used within a regular SBN newscast or on a Company-owned web platform.

33. When SBN terminated the employment of Terminated Employees, it failed to pay certain Terminated Employees fees for wraps and/or voicers that were produced and used within a regular SBN newscast or on a Company-owned web platform during the period August 1, 2017, through August 31, 2017.

34. The amount of retroactive pay owed to each Terminated Employee for wraps and/or voicers that were produced and used within a regular SBN newscast or on a Company-owned web platform during the period August 1, 2017, through August 31, 2017, as set forth in Exhibit C, is accurate.

35. Because of SBN's failure to pay certain Terminated Employees for wraps and/or voicers that were produced and used within a regular SBN newscast or on a Company-owned web platform during the period August 1, 2017, through August 31, 2017, SBN owes Terminated Employees retroactive pay for said wraps and/or voicers in the amounts set forth in Exhibit C.

36. Schedule III, Section 3 of the CBA requires SBN to reimburse bargaining unit employees for expenses incurred in the performance of their assigned duties.

37. Schedule III, Section 3 of the CBA also requires SBN to pay bargaining unit employees' mileage for use of their personal vehicle outside of the locality for business purposes.

38. April Ryan was a bargaining unit employee of SBN until her resignation on October 28, 2016.

39. On June 28, 2016, April Ryan submitted receipts for reimbursement for expenses incurred in the performance of her assigned duties during the period December 1, 2015, though June 28, 2016.

40. On June 28, 2016, SBN received receipts for reimbursement for expenses April Ryan incurred in the performance of her assigned duties during the period December 1, 2015, though June 28, 2016.

41. SBN has not reimbursed April Ryan for expenses she incurred in the performance of her assigned duties during the period December 1, 2015, though June 28, 2016.

42. SBN owes April Ryan $1,588.39 in unreimbursed mileage and expenses.

43. Pursuant to April Ryan contract with SBN, SBN was to provide April Ryan with a $7,500 clothing allowance.

44. SBN did not pay April Ryan her $7,500 clothing allowance prior to her resignation in 2016.

45. SBN owes April Ryan $7,500 in clothing allowance.

46. Schedule I, Section 3 of the CBA allows for bargaining unit employees to authorize SBN to withhold union dues from their paychecks and remit said dues to SAG-AFTRA.

47. Certain bargaining unit employees authorized SBN to withhold union dues from their paychecks and remit said dues to SAG-AFTRA.

48. SBN withheld union dues from the paychecks of certain bargaining unit employees.

49. SBN failed to remit to SAG-AFTRA union dues that SBN withheld from the paychecks of certain bargaining employees.

50. SBN has failed to remit $2,293.09 in union dues to SAG-AFTRA.

51. The total amounts SBN owes to bargaining unit employees or SAG-AFTRA pursuant to each specification of the Grievance are accurately set forth in the attached Exhibit D.

Brian Lysell
Executive Director
Ohio-Pittsburgh Local
SAG-AFTRA

Ron Davenport, Jr.
President
Sheridan Broadcasting Networks

# EXHIBIT B

| First | Last | Date of Hire | Date of Termination | Pay in Lieu of Written Notice of Termination | Severance Pay |
|-------|------|--------------|---------------------|----------------------------------------------|---------------|
| Victoria | Cohill | 6/23/2008 | 8/31/2017 | $4,089.10 | $18,400.95 |
| Brian | Cook | 6/29/2003 | 8/31/2017 | $3,094.30 | $20,112.95 |
| Patricia | Griffin | 4/1/2013 | 8/31/2017 | $3,001.27 | $228.26 |
| Desaundra | Harris | 3/26/2001 | 8/31/2017 | $2,592.46 | $16,850.99 |
| Jazzmonde | James | 3/17/2014 | 8/31/2017 | $1,132.38 | $950.63 |
| Allegra | Johnson | 2/5/2001 | 8/31/2017 | $2,333.98 | $15,170.87 |
| Trevin | Jones | 1/22/2007 | 8/31/2017 | $3,604.96 | $8,555.50 |
| Kim | Lampkins | 7/1/2002 | 8/31/2017 | $5,801.84 | $37,711.96 |
| Ty | Miller | 7/9/1990 | 8/31/2017 | $7,295.84 | $47,422.96 |
| Danielle | Smith | 2/1/2010 | 8/31/2017 | $2,264.77 | $4,993.72 |
| Caitlyn | Starkey | 2/16/2016 | 8/31/2017 | $1,132.38 | $286.33 |

# EXHIBIT C

| First | Last | Back Pay for failure to timely implement November 8, 2016 three-percent (3%) increase | Back Pay for failure to pay wages or salary during the period August 16, 2017, through August 31, 2017 | Back Pay for failure to pay for wraps and/or voicers |
|-------|------|---------|---------|---------|
| Victoria | Cohill | $416.85 | $2,044.55 | |
| Brian | Cook | $315.49 | $1,547.15 | $80.00 |
| Patricia | Griffin | $137.66 | | |
| Desaundra | Harris | $203.94 | $1,296.23 | $1,120.00 |
| Jazzmonde | James | $84.69 | $849.00 | |
| Allegra | Johnson | $203.94 | $1,166.99 | $670.00 |
| Trevin | Jones | $181.34 | $1,698.48 | $40.00 |
| Kim | Lampkins | $507.00 | $2,900.92 | |
| Ty | Miller | $547.19 | $3,674.92 | |
| Danielle | Smith | $129.79 | $764.10 | $190.00 |
| Caitlyn | Starkey | | $707.50 | $80.00 |

# EXHIBIT D

| Specification | Amount Owed |
|---|---|
| Failure to pay Terminated Employees in lieu of giving written notice of their termination. | $36,343.29 |
| Failure to pay Terminated Employees severance pay. | $170,685.12 |
| Failure to timely implement November 8, 2016 three-percent (3%) increase. | $2,812.38 |
| Failure to pay Terminated Employees for time worked during the period August 16, 2017, through August 31, 2017, and for wraps and voicers produced during the period August 1, 2017, through August 31, 2017. | $18,829.84 |
| Failure to pay April Ryan for clothing allowance and mileage and expenses incurred in the course of her employment. | $9,088.39 |
| Failure to remit to SAG-AFTRA union dues withheld from bargaining unit employees paychecks. | $2,293.09 |